(C. D. 1148)

TIMBER ENGINEERING COMPANY, INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided December 22, 1948)

*Dickey, Foley & Olverson* (*James F. Foley* and *James P. Burns* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before LAWRENCE and TILSON, Judges; RAO, J., not participating

LAWRENCE, Judge: Plaintiff imported certain articles composed of steel which are described on the consular invoice as "Split Rings." They were classified by the collector of customs pursuant to the provisions of paragraph 397 of the Tariff Act of 1930 as—

Articles or wares not specially provided for, * * * composed wholly or in chief value of * * * steel * * * but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured * * *

and duty was imposed thereon accordingly at the rate of 45 per centum ad valorem.

In the original protest, plaintiff claims that the articles should be classified within the provision for—

* * * pressed, sheared, or stamped shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping; * * *

as provided in paragraph 304 of said act and the trade agreement between the United States and Sweden, effective August 5, 1935, 68 Treas. Dec. 19, T. D. 47785. Although no rate of duty is invoked in the protest, it is presumed that the rate relied upon by plaintiff is 20 per centum ad valorem, which is the only rate specified in the trade agreement for pressed, sheared, or stamped shapes.

The protest also claims alternatively that the articles are dutiable at 10 per centum or 20 per centum ad valorem under paragraph 1558 of said act as unenumerated articles, and further that the articles are dutiable "as claimed directly, indirectly, or by similitude under par. 1559."

By amendment duly filed, plaintiff restated its claim for classification as pressed, sheared, or stamped shapes, pursuant to paragraph 304, and the Swedish Trade Agreement, *supra*, without specifying any rate of duty.

By said amendment plaintiff also claims that the articles should be classified in paragraph 312 of said act as—

* * * structural shapes of * * * steel, * * * machined, drilled, punched, assembled, fitted, fabricated for use, or otherwise advanced beyond hammering, rolling, or casting,

and held dutiable at 20 per centum ad valorem.

Although plaintiff lays much emphasis upon the contention that the articles are properly dutiable as structural shapes, the other alternative claims have not been abandoned. We shall therefore give careful consideration to all of them.

The case has been ably presented and we are favored with the testimony of well-qualified witnesses who displayed a very intelligent knowledge of the subject. A sample illustrating the imported split rings was received in evidence as exhibit 1 and other exhibits were introduced to illustrate; the character and use of split rings in industry.

No effort was made to establish a commercial or trade understanding of the tariff designations relied upon by plaintiff and we shall therefore proceed upon the assumption that the common and commercial meanings of the terms are the same. The rule applicable here is correctly stated in the brief of plaintiff as follows:

In a tariff sense, language will be presumed to have the same meaning in commerce which it has in ordinary use unless the contrary is shown. *Acker* v. *United States*, 1 C. C. A. 328, T. D. 31431 (1911).

We shall consider first the claim that the articles should be classified as "pressed, sheared, or stamped shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping" as provided in said paragraph 304. In determining whether the articles properly fall within the language of that paragraph, it is important to examine the record for the purpose of ascertaining, among other things, the precise method by which the imported articles were fabricated.

Plaintiff's first witness, James H. Carr, testified that he is secretary of the Timber Engineering Co., Inc., the plaintiff herein; that he had been employed by the company for 11 years; is a graduate of the Massachusetts Institute of Technology; that he visited Montreal for the purpose of inspecting the stock or material from which the imported articles were made and of purchasing the importation; that he was familiar with the process by which the articles were fabricated from observing the operation, stating that—

The article is fabricated by shearing off lengths from a strip—the length sheared off being just sufficient to fold into this circumference.

Q. Is that a flat strip?—A. That is a flat strip that has a special cross section according to our design. This product is then put through four different pressing operations and when it comes out of the final press, it is in the form that we have it here.

Q. Are you referring to pressing operations—how are these pressing operations conducted, with dies?—A. They are dies; that is, a female and male die, put in a large press and the two dies come together and gradually form it more and more toward the circle, until the circle is finally accomplished.

Q. How many operations does that require?—A. To my knowledge, it is four operations.

Q. What are those operations termed?—A. Well, the four operations are, the shearing operation, then there are four pressing operations going through the press which through a series of bends in the metal, made by the dies, finally bring it around to the circular shape.

When asked if the articles were fabricated for use at the time of importation, witness Carr replied: "Yes, sir. They were fabricated in the shearing and pressing operations." The testimony of other witnesses establishes without contradiction that the articles in their imported condition are ready for immediate use in industry.

Plaintiff's second witness, H. Pheatt, testified that he was treasurer of the Toledo Press Co., manufacturers of stampings, having been identified with that company for 20 years; that his concern had manufactured articles like exhibit 1 for the plaintiff corporation since 1933; and when asked how the device was manufactured, he stated—

Well, by four operations. Shearing operation is the first one where we cut the tongue and groove and shear it off to length, and the next three operations are by stamping process.

It is observed that whereas the witness Carr testified to four pressing operations after the shearing operation, Pheatt recognized but three, which he characterized as stamping processes but which Carr designated as "pressing operations." When asked if he used the word "stampings as synonymous with press operations," Pheatt replied, "Yes, we do."

Upon this phase of the controversy counsel have not cited any case authority in support of the classification of the steel split rings in paragraph 304, *supra*. It would seem, however, that the following cases are authority for denying classification of the articles in that paragraph.

In *Lunham & Moore* v. *United States*, 2 Ct. Cust. Appls. 1, T. D. 31569, it was held that certain articles of steel which had been subjected to shearing, stamping, or pressing processes, and then enameled, ready to be joined with other necessary parts to form finished articles of enameled ware, were more aptly described in paragraph 193 of the Tariff Act of 1897 as "articles or wares" composed of steel, whether wholly or partly manufactured, than in paragraph 135 of that act as "pressed, sheared, or stamped shapes" or as "steel in all forms and shapes."

Again in the case of *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, the court referred to the *Lunham & Moore* case, *supra*, and other authorities on the subject, and held that the provisions of paragraph 304 of the Tariff Act of 1922, which correspond with the controversial language of paragraph 304 of the Tariff Act of 1930, were intended to provide for *materials* for further manufacturing processes and not for completely manufactured products.

A later case, cited in the collector's letter filed with the papers herein and which doubtless motivated his action in excluding the articles in question from paragraph 304, *supra*, is *Braun-Steeple Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 437, T. D. 44683. It was there contended that sheets of steel about one thirty-second of an inch in thickness, 6 feet in length, and 3 feet in width, in which perforations had been stamped, forming various fancy designs, were dutiable as stamped shapes under paragraph 304 of the Tariff Act of 1922. In denying that claim, the court followed the principle laid down in *Lunham & Moore* v. *United States, supra*, and *United States* v. *Frank, supra*, expressing approval of those cases in the following language:

> In the case of *United States* v. *Frank, supra*, this court referred to the *Lunham & Moore* case, *supra*, and other authorities on the subject, and held that paragraph 304, *supra*, was intended to provide for materials for further manufacturing processes and not for completely manufactured products.

Moreover, in the *Braun-Steeple Co.* case, *supra*, the court referred to *United States* v. *Veith*, 169 Fed. 665, T. D. 29674, wherein it had been held that certain finished articles were dutiable as "pressed, sheared, or stamped shapes" under the provision in paragraph 135 of the Tariff Act of 1897 and observed that—

> * * * it is evident that the principles upon which that decision was based have been repudiated by this court.

It is not disputed that the use of the steel split rings in controversy is as described earlier in this opinion. Also, there is no dispute between the parties on the point that in their condition as imported these split rings are completely finished and ready for their intended use. In the light of the authorities discussed, *supra*, we are clearly of the opinion that the processing of a piece of steel which by a shearing operation has been cut to an appropriate length, tongued, and grooved, and by three or four subsequent operations of pressing or stamping has been gradually bent into a complete circle, has produced an article acquiring a new name, character, and use. Consequently, it has emerged from the class or kind of materials designated as "pressed, sheared, or stamped shapes" in paragraph 304, *supra*, and has become a finished manufacture of steel.

Therefore, we are of the opinion that the claim of plaintiff for classification of the commodity in paragraph 304, *supra*, is untenable and it is hereby overruled.

The conclusion just reached, however, does not relieve us from determining whether as manufactures of steel the articles may be more specifically described in paragraph 312 of the Tariff Act of 1930 as structural shapes of steel, as alternatively claimed, and we shall proceed to examine the record on that phase of the case.

Plaintiff's witness Carr, whose qualifications have been set out earlier in this opinion, explained that the articles under consideration are—

* * * used in timber structure for the transmission of stress between members. They are placed into pre-cut grooves which are prepared by a special tool furnished by our company, and developed [sic] the load capacity between the members. This ring here is capable of carrying approximately 3,000 pounds when used parallel to the grain.

He testified that they have been widely used for the past 13 years in fabricating truss spans "all the way from 20 feet up to 260 feet"; that the Navy blimp hangars which are the biggest wooden structures in the world employed this system of construction, the witness expressing the opinion that it is probable that the Navy could not have built such hangars prior to the introduction of this ring because of the inefficiency of joining methods previously available.

This witness stated that these split rings responded to the following definition of a "structural shape" quoted from Webster's New International Dictionary of the English Language, Second Edition, Unabridged, Copyrighted in 1945 by G. & C. Merriam Co., which reads:

structural shape. Engin. & Arch. The shape of a member especially adapted to structural purposes, esp. in giving the greatest strength with the least material * * *.

Defendant's witness, Frederick H. Frankland, testified that he had been a bridge and structural engineer for 35 years with broad experience in that field and was shown to be otherwise well-qualified; that having designed and supervised the construction of wooden bridges, arch bridges, trestles, and various commercial buildings in which split rings were used, he had become thoroughly familiar with the manner and purpose of their use; that bolts and split rings in lumber construction serve basically the same purpose for fastening members together as rivets or bolts would serve in steel construction; that although this witness had never had occasion to design timber structures which utilized the connector rings, he had nevertheless inspected timber structures which were so put together, having acted in an advisory capacity to the Bureau of Aeronautics, United States Navy, and was considered an expert in the economics of design. He pointed out that—

* * * If in these hangar trusses timber connector rings had not been used, much larger, more cumbersome joints with a larger number of bolts would have to have been used to develop the strength of the timber and to keep within the allowable unit bearing pressure on the timber. That is the basic idea of the ring.

This witness was clearly of the opinion that these split rings were not structural shapes, which he defined as follows:

A structural shape is a steel, or metal, or wood member, or member made of any other material, structural material, that serves or can serve as a member in a framework, in a structural framework.

Further he testified—

A structural shape, strictly speaking, is a rolled structural steel member that is used for unit member construction in a structural framework. It may be a column. It may be a beam. I would like to amplify that by saying a structural shape may also be a generic term applying to a built-up plate girder that is made from an assemblage of structural shapes and plates fastened together with rivets, or bolts, or welded. That could be, and is called a structural shape if it is for use in a structural framework. A structural shape is a member which is designed to most economically transmit tension, · compression, sheer, or bending, due to exterior loads.

The witness also testified that—

A structural shape is still a structural shape before it is worked into a framework, but when it is worked into a framework the structural shape not only remains a structural shape, but it also becomes a structural member, which it wasn't until it was worked into the framework.

and continuing—

XQ. Using plaintiff's Illustrative Exhibit 2 as an illustration, you say if these two timbers are joined together by this split ring connector, and the bolt is inserted, then the split ring connector does not become a member of this structure?— A. Most certainly not, just the same as the bolts.

     *      *      *      *      *    · *      *

* * * A structural member is designed and used and functions to resist stress. A connecting element, such as rivets, bolts, or connector rings, serve the function of *transmitting* the stress that is resisted by one member to another member to which it is connected, which in turn resists the stress. That is the basic concept of a structural framework. All engineering structures must be in equilibrium in resisting loads and stresses. [Emphasis added.]

It seems obvious from the testimony of this witness that while a structural shape is employed to resist tension, compression, shear, or bending, split rings do none of these things. They merely transmit tension or stress from one timber to another.

Harry F. Rose was also called as a witness by the defendant. He testified that he is a civil engineer, a graduate of the University of Michigan, and for the past 24 years has been working as a structural engineer for railroads, highways, bridges, water supply, and general building construction, and since 1944 has been associated with an organization known as Timber Structures in charge of design and construction. When shown exhibit 1, he stated that he had used many of them and that in his opinion split rings are not structural shapes but are connecting devices, and that in timber structures he uses split rings for the same general purpose as bolts.

The plaintiff then called to testify on its behalf Frank J. Handrahan who stated that he is chief engineer of the National Lumber Manufacturers Association; that his work is primarily concerned with engineering standards and technical consultation on the use of wood in various structures and other technical applications of wood. This witness testified that since graduation from Purdue University in

1927 with a civil engineering degree, he has been engaged in teaching, research, and practical work in various phases of the engineering field, and that he is an officer or member of numerous engineering societies, the names of which we do not deem it necessary to set forth here. He testified further that he has written a large number of articles pertaining to engineering, stating "probably the outstanding one of which I was principal author of was the National Design Standards for Stress Grade Lumber and its Fastenings. This publication is accepted rather generally nationally as the standard for design in lumber." He also testified that he was familiar with the manner of use of split rings like exhibit 1.

In answer to the question on direct examination—

* * * how is the term structural shape employed in usage in conventional rolling mill parlance?

he replied:

The term structural shape in rolling mills is employed in a very restricted manner to refer to certain specific sections of metal rolled in the mill. However, that is not the general definition of structural shape that is generally accepted by engineers. The general definition ´or understanding is much wider than that and would include terms such as listed in the paragraph you just handed me. [Paragraph 312, Tariff Act of 1930.]

He added that he did not regard a "joist" to be a structural shape in the narrow sense used in a rolling mill, but that it is a structural shape in the general sense used by engineers.

The witness agreed substantially with the definition of a structural shape previously given by witness Frankland, and stated—

* * * It appears also that Mr. Frankland tried to draw a distinction between the limited use in a rolling mill of structural shape and that in general use by engineers in a design construction field. I think I would amend it somewhat in saying that we would not want to limit the type of stresses to compression, sheer, or bending, probably wanting to include torsion and other stresses as well. I would gather that Mr. Frankland gave these as illustrations of what he means and certainly if that were the case, it would conform to my understanding of the structural shape.

When asked whether the split ring represented by exhibit 1 came within the definition just referred to, the witness replied—

Yes, in a general definition but not in a limited or specific definition used by rolling mill and rolling mill parlance or in the mill itself. In other words, this particular shape would not be regarded as a structural shape in a rolling mill but it would be in general engineering use.

and added that he disagreed with Frankland's statement that the split ring is not a structural shape, and testified that—

* * * the split ring conforms to the structural shape in a broader sense.

He also stated that a structural shape can be circular in form and "can be most any shape as long as it serves the function of resisting and transferring stress and strain in a structure." He stated further—

\* \* \* During the war, there were structures known as "camels" which were used between boats and other boats or between boats and wharves during loading and unloading operations to prevent the ships from damaging each other. The main structural shape used in that construction was circular in form and it has actually been referred to as a split ring. You also have the example of a chain composed of a series of links which are circular in form or generally curved.

PRESIDING JUDGE OLIVER: You mean by your testimony, sir, a chain so formed is a structural shape?

THE WITNESS: Yes, sir, in a broad sense. You have commonly used in bridge construction a bar with circular loops on each end for the placement of pins. That is circular in shape on the ends. Those are a few examples.

Witness Handrahan testified that it would not be possible for a structural shape to transfer shear without its being able to resist that shear and that exhibit 1 is capable of resisting shear.

On cross-examination, this witness confirmed his testimony that a chain is a structural shape and stated that "a structural shape is any shape which economically resists or transfers stress and strain in a structure," and further that in a sense a dog chain is a structural shape. When asked the purpose of using these split rings, he replied:

The purpose of using these split rings is to transmit and resist sheer, in many cases and it could also resist many stresses, but they are an essential component part of the structure.

He stated that they are a more efficient type of connection than a bolt; that you do not need as many bolts with a split ring because—

\* \* \* a bolt also resists and transmits load, so does a split ring. Now, when they function together, the ring does part of the work, the bolt does part of the work.

He also testified that a bolt transmits and resists shear, adding that in a general sense bolts, rivets, and the laminating material used in plywood construction are structural shapes.

What constitutes a structural shape has been passed upon many times by this and our appellate court.

In *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, the court held, *inter alia*, that steel channel irons and steel bars or grates, materials ready to be assembled as parts of a mash filter, were structural shapes and within the scope of paragraph 104 of the Tariff Act of 1913. In that case, the court stated—

Although a structure has been defined to be a production composed of parts artificially joined together according to plan and designed to accomplish a definite purpose it may well be doubted whether that definition any longer precisely and truly describes a structure as the word is generally and customarily used. Ordinarily speaking, "structure" carries with it the idea of size, weight, and strength, and it has come to mean anything composed of parts capable of resisting heavy weights or strains and artificially joined together for some special use. But however that may be, certain it is that the expression "structural shapes" does import to people in general a capacity to sustain heavy weights or to resist great

tension or both, and the things denominated in paragraph 104 convince us that such were the "structural shapes" which Congress intended to subject to the duty therein prescribed.

In *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, T. D. 46038, the court had before it for decision the question whether certain imported steel angles, some 2 by 2 by three-sixteenths inches imported in 30-foot lengths, and others 2 by 2 by one-fourth inches imported in 20-foot lengths, were dutiable as "steel not specially provided for" under paragraph 304 of the Tariff Act of 1922, as classified by the collector, or as "angles" within the provision therefor in paragraph 312 of said act. The court there stated:

> Without intending to be understood as giving precise definitions of the terms "angles" and "structural shapes," as those terms were used by the Congress in paragraph 312, we should, nevertheless, in considering the purposes of the Congress, take into consideration the common meanings of those terms, together with the summaries of tariff information before the Congress at the time the paragraph was enacted.

After resorting to such sources of information, the court further stated—

> * * * Accordingly, we are of opinion that the Congress did not intend to limit the term "structural shapes" to such shapes of iron and steel as were used only in large structures, but that it intended to include therein all structural shapes of iron or steel having the "capacity to sustain [relatively] heavy weights or to resist great tension or both," and designed for the utilization of such capacity, to be used as such shapes, and suitable for such use in buildings, bridges, ships, cars, etc., requiring either heavy or light sections, or both, and also in certain "other articles *requiring light sections*" only. [Italics quoted.]

In conclusion, the court held the importation to be "structural shapes of steel—angles—and *eo nomine* provided for" in paragraph 312 of the Tariff Act of 1922. Note also *United States* v. *Julius Blum & Co., Inc.*, 26 C. C. P. A. (Customs) 168, C. A. D. 12; and *E. L. Soule & Co.* v. *United States*, 16 Ct. Cust. Appls. 524, T. D. 43240.

In *Otis McAllister & Co.* v. *United States*, 27 C. C. P. A. (Customs) 4, C. A. D. 52, the classification of certain galvanized, corrugated iron sheets for use in forming the walls and roofs of buildings by being attached to the framework thereof was in controversy. The collector of customs had classified the importation within the provisions of paragraphs 308 and 309 of the Tariff Act of 1930 for galvanized, corrugated iron sheets. The importer's claim was for classification of the merchandise in paragraph 312 of said act as "all other structural shapes of iron or steel."

In the course of its opinion in the *McAllister* case, *supra*, the court stated:

> The question as to what constitutes structural shapes has been before this court in prior cases. However, no precise definition of structural shapes can

be laid down to cover the term. Each case must be determined in the light of its record. *Judson Freight Forwarding Co.* v. *United States*, 20 C. C. P. A. (Customs) 229, 235, T. D. 46038.

It was the court's opinion that "as to load carrying and wind resistance the elements of the building designed to function in these respects is not the coverings but the framework." It was further stated in that case "that any strength that may be incorporated in a structure by the use of the imported merchandise is at best incidental," the court adding—

> To hold that the sheets which cover the framework in a building are structural shapes would, inevitably, lead us far afield. *European Trading Co.* v. *United States*, 19 C. C. P. A. (Customs) 82, T. D. 45225.

The contention of the plaintiff in that case was overruled and the classification of the merchandise by the collector as galvanized, corrugated iron sheets within the purview of paragraphs 308 and 309 of the Tariff Act of 1930 was sustained.

From the record in the case before us, it appears that the split rings or timber connectors (which is another name for the articles) were an innovation in timber construction and have proven to be an efficient means of economizing on building materials in times of scarcity. From the testimonial record, as well as from a physical inspection of collective illustrative exhibit 2, it will be readily seen that to prepare timbers for the appropriate use of these split rings, annular grooves of the diameter of the rings and one-half of their depth are countersunk by a rotary tool in the faces of timbers which are to be joined. A ring is placed in one of the grooves with one-half of its surface exposed and the faces of the two pieces of grooved timber are brought together flush so that the ring is completely embedded. A bolt is then inserted in a hole through both timbers which incidentally passes through the center of the ring. This method of joining timbers in wooden structures replaces the use of at least three or four bolts. For this reason, these split rings are recognized as an ingenious and important development in timber engineering since they combine a high degree of efficiency with economy.

It is shown by the record before us that the timbers and not the split rings sustain weight or resist tension. It also appears that the split rings are really a substitute for bolts, and bolts, like nails, rivets, and screws, are not in our opinion structural shapes within the meaning of paragraph 312 of the Tariff Act of 1930. Accordingly, we hold that the articles here in controversy are not structural shapes within the scope of said paragraph 312 as construed by the courts in the cases referred to, *supra*, and cases cited therein. To hold to the contrary "would, inevitably, lead us far afield." (See *Otis McAllister & Co.* v. *United States, supra.*)

Therefore, the claim of the plaintiff herein for classification of the importation in issue within the provisions of paragraph *312, supra*, must be and hereby is overruled.

As to plaintiff's alternative claim for classification of the merchandise pursuant to the similitude clause in paragraph 1559, attention is invited to the following extract from the case of *Arthur's Executors* v. *Butterfield*, 125 U. S. 70, at page 76 —

* * * That clause only provides that there shall be levied on each non-enumerated article which bears a similitude, either in material, quality, texture, or the use to which it may be applied, to any article enumerated as chargeable with duty, the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars mentioned. Rev. Stat. § 2499. To place articles among those designated as enumerated, it is not necessary that they should be specifically mentioned. It is sufficient that they are designated in any way to distinguish them from other articles. Thus the words "manufactures of which steel is a component part," and "manufactures of which glass is a component part," have been held a sufficient designation to render the goods enumerated articles under the statute, and take them out of the similitude clause. *Arthur* v. *Sussfield*, 96 U. S. 128. * * *

In view of the applicability of the provisions of paragraph 397 of the Tariff Act of 1930 to the articles in controversy, plaintiff's claim under the similitude clause is without merit. Likewise, the alternative claim for classification of the split rings as unenumerated articles in paragraph 1558 of said act is held to be untenable.

After carefully weighing the evidence before us, we are clearly of the opinion that plaintiff has failed to overcome the presumption of correctness which attaches to the decision of the collector of customs herein. Moreover, the authorities which have been briefly analyzed, *supra*, lead us to the conclusion that none of the claims invoked by plaintiff can be sustained.

All claims of the plaintiff are, therefore, overruled, and the classification of the collector of customs is approved.

Judgment will be entered accordingly.