BEFORE THE SECOND DIVISION, MAY 9, 1950

No. 54322.—Kilian Manufacturing Corporation *v.* United States, protest 135389–K (Rochester).

LAWRENCE, Judge: An importation of stamped steel housings, so-called, was assessed for duty by the collector of customs at the rate of 45 per centum ad valorem pursuant to the provision in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397) which provides for "Articles or wares not specially provided for, * * * if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured."

Plaintiff contends that the articles should have been classified in accordance with the provision in paragraph 304 of said act (19 U. S. C. § 1001, par. 304) for "* * * stamped shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping, * * * valued above 16 cents per pound" and held dutiable at the rate of 20 per centum ad valorem.

It is alternatively claimed that the articles should have been classified in accordance with the provision in paragraph 372 of said act (19 U. S. C. § 1001, par. 372) for parts, not specially provided for, of machines, finished or unfinished, not specially provided for, and assessed with duty at the rate of 27½ per centum ad valorem.

The testimonial record is limited to the testimony of two witnesses introduced on behalf of the plaintiff.

The first witness, John Moore Lorimer, stated that he is the general manager of the Fischer Bearings, Canada, Limited, and has charge of the sales of that company which is engaged in "the distribution of balls and roller bearings" and that his company is the sales representative of the Kilian Manufacturing Corporation in Canada; that he obtained the articles in controversy for the importing company and he identified collective exhibit 1 as representing the imported commodity which was produced by the Wright Industries, Limited, of Toronto, Canada, manufacturer of metal stampings. The witness further testified that he was familiar with the business of that company, having visited its plant on many occasions and observed the production of merchandise like collective exhibit 1. He described the method of production substantially as follows: Steel used in the manufacture of the imported articles is supplied in strips 2⅞ inches wide; the strips are fed into a Hunton Press in which there is a progressive die, and that die completes the full operation of forming the stamping from the strip to its finished shape.

This statement seems to have been qualified, however, by further testimony of the witness who stated that a second process was applied, as indicated by the following excerpt from the stenographic minutes:

Q. Is that all the process that is used in manufacturing this?—A. We designed that die to form that stamping in one operation. It has never been done before in so simple an operation, but, unfortunately, the dies wouldn't hold size——

\* \* \* \* \* \* \*

Q. What else, if anything?—A. After the first shape comes out, it was taken and sized, trued up on another press.

Q. What was the purpose of that?—A. As I understand it, the purpose of that stamping, if it isn't correct in size, then this other operation corrects that, if there needs to be any correction.

The witness further stated—

The stamping process is completed in a second lighter machine.

\* \* \* \* \* \* \*

There is a sizing die in the second machine which produces the finished article true to size.

On cross-examination the witness was asked if collective exhibit 1 was a finished commercial article, to which he replied: "I don't know. To me it's a matter of stamping."

It also appears from the record that the use of the commodity is for holding ball bearings, which is the purpose for which it was manufactured. When asked if it could be used for other purposes, the witness replied: "It could be used for anything you wanted to use it for, if you could find a use for it."

It further appears from the testimony of witness Lorimer that the second machine above referred to is a stamping machine or press and that "ninety percent of stampings have to go through two machines" to produce merchandise like collective exhibit 1.

The second witness, Frederick Kilian, testified that he was president and treasurer of the Kilian Manufacturing Corporation which appears as the plaintiff herein; that the corporation is engaged in the "manufacture of ball-bearings and things that are similar, allied with ball-bearings. Primarily ball-bearings, casters." When interrogated as to the use of collective exhibit 1, he testified:

That particular item, your Honor, is used as a spacer between the ball-bearing and the roller used in a conveyor, due to its cheapness, rather than make a ball-bearing of that dimension to fit a big roller. These rollers are generally known to be in sizes of two and a quarter inches. When we come to a smaller roller, we do away with the adapter, and press the bearing to fit the roll. We use that on sections in connection with beer delivery trucks, and that sort of thing. But when we go to big rollers our customers don't want to pay the price for the big bearing made of that dimension as your Exhibit Number 1 there, as we use this stamping as an adapter, as a filter [sic], to fill the gap between the inside of the roll and the outside diameter of the ball-bearing itself.

The witness continued to testify as follows:

Q. In other words, a ball-bearing is placed in the inside of this article?—A. That's right.

Q. Then the article is—then the article plus the bearing is put in the end of the roller?—A. Yes.

Q. Does that have an axle?—A. Yes.

An article identified as a bearing was received in evidence as exhibit 2.

While not entirely clear from the testimony it would appear that the bearing, exhibit 2, is intended to be inserted within collective exhibit 1, sometimes referred to as an adapter or spacer, which is then used as above described in gravity conveyors.

In support of its claim for relief under paragraph 304, *supra*, plaintiff refers to the case of *United States* v. *Frank*, 15 Ct. Cust. Appls. 97, T. D. 42184, wherein our appellate court in determining the classification of steel sheet piling held that paragraph 304 of the Tariff Act of 1922 did not apply to the importation there in controversy inasmuch as it was composed of *articles* whereas said paragraph 304 applied only to *materials* to be used in further manufacturing processes.

Reference was likewise made by plaintiff to the case of *Summerfield's (Inc.)* v. *United States*, 59 Treas. Dec. 1164, T. D. 44890, wherein certain stamped steel shapes were held to come within the purview of paragraph 304 of the Tariff Act of 1922 inasmuch as "They are, in every sense of the term, simply material out of which many articles may be made," it having been shown that the imported shapes, the product solely of a stamping process, served as material for making

ornaments, and from an examination of the shapes as imported "it would be impossible to say * * * precisely what their ultimate form and shape will be or of what article they may become a part."

It is the contention of plaintiff that the articles here in controversy are, like the importation in the *Summerfield's* case, *supra*, simply a material. With this contention, we are not in accord. While the stampings in controversy in their first estate may be considered to be unfinished, they were subsequently subjected to another process which was described by the witness Lorimer as "sizing" or "truing up" on another press "which produces the finished article true to size." From the testimonial record it appears that this was a necessary process to fit the articles for their intended use.

The fact that on cross-examination witness Lorimer testified that "ninety percent of stampings have to go through two machines" is of no materiality here. That generality was not particularized as to the importation in controversy since no evidence whatsoever was presented to show whether any of the articles in question had not been subjected to the second processing.

Upon the record before us and from a visual examination of collective exhibit 1, as representative of the importation, we are of opinion that the ball-bearing spacers or adapters are more than mere material and have assumed the character of articles, namely ball-bearing spacers or adapters for use on gravity conveyors. Therefore, in the light of the *Frank* and *Summerfield's* cases, *supra*, noting also the cases of *Braun-Steeple Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 437, T. D. 44683, and *Timber Engineering Company, Inc.* v. *United States*, 22 Cust. Ct. 1, C. D. 1148, it follows that the articles in controversy being more than material do not come within the purview of paragraph 304, *supra*, as primarily alleged by the plaintiff. That claim must be, and hereby is, overruled.

We return now to plaintiff's alternative contention that the articles should be classified as parts of "all other machines, finished or unfinished, not specially provided for" under paragraph 372 of said act. While the record before us is to the effect that the imported spacers or adapters are used with ball bearings in connection with so-called "gravity conveyors," which latter articles are not more particularly described but which might have been shown to possess some of the attributes of "machines," as indicated in *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537, namely, a mechanical contrivance for utilizing, applying, or modifying energy or force, or for the transmission of motion, we are unable to determine from the record whether the articles in controversy would constitute "parts" of machines, as the word "parts" has been judicially defined. In *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851, the court stated—

It is a well-established rule that a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*. *Welte & Sons* v. *United States*, 5 Ct. Cust. Appls. 164, T. D. 34249; *United States* v. *American Steel & Copper Plate Co.*, 14 Ct. Cust. Appls. 139, T. D. 41673; *Peter J. Schweitzer, Inc.* v. *United States*, 16 Ct. Cust. Appls. 285, T. D. 42872, and cases cited therein; *United States* v. *John Wanamaker*, 16 Ct. Cust. Appls. 548, T. D. 43266. [Italics quoted.]

The record before us is devoid of proof that the items in controversy are integral, constituent, or component parts of the articles with which they are to be joined, to wit, gravity conveyors, and that said gravity conveyors are machines within the judicial construction of that term.

The court may not be expected to supply from imagination facts which, if really true, are susceptible of proof.

Consequently, we are constrained to hold upon this record that the claim of plaintiff for classification of the present importation under paragraph 372, *supra*, has not been established, and must be, and hereby is, overruled.

Judgment will be entered in accordance with the views herein expressed.