**COMMERCIAL SHEARING & STAMP-ING COMPANY**

v.

**UNITED STATES (Guadalupe Industrial Supply Company, Inc., Party-in-Interest).**

**C.D. 4060; Protest Nos. 67/77598–5832.**

United States Customs Court,
Third Division.

Aug. 7, 1970.

TSUS, dutiable at 19 per centum ad valorem under TSUS item 657.20.

The complete text of the TSUS classification "angles, shapes, and sections" in schedule 6, part 2, provides as follows:

*Subpart B.—Iron or Steel*
*Subpart B headnotes:*

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

\* \* \* \* \* \*

Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, or drawn, or cold formed or cold finished, whether or not drilled, punched, or otherwise advanced; sheet piling of iron or steel:

Angles, shapes, and sections:
  Hot rolled; or, cold formed and weighing over 0.29 pound per linear foot:
    Not drilled, not punched, and not otherwise advanced:

| | | |
|---|---|---|
| 609.80 | Other than alloy iron and steel | 0.1¢ per lb. |
| 609.82 | Alloy iron or steel | \* \* \* |

    Drilled, punched, or otherwise advanced:

| | | |
|---|---|---|
| 609.84 | Other than alloy iron or steel | \* \* \* |
| 609.86 | Alloy iron or steel | \* \* \* |

  Cold formed and weighing not over 0.29 pound per linear foot:

| | | |
|---|---|---|
| 609.88 | Other than alloy iron or steel | 8.5% ad val. |
| 609.90 | Alloy iron or steel | \* \* \* |

Sheet piling:

| | | |
|---|---|---|
| 609.96 | Other than alloy iron or steel | \* \* \* |
| 609.98 | Alloy iron or steel | \* \* \* |

Plaintiff's claim under schedule 6, part 3, subpart G provides in pertinent part as follows:

*Subpart G.—Metal Products Not Specially Provided For*
*Subpart G headnotes:*

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \*

Articles of iron or steel, not coated or plated with precious metal:
  Cast-iron articles, not alloyed:

\* \* \* \* \* \*

  Other articles:

| | | |
|---|---|---|
| 657.15 | Of tin plate | \* \* \* |
| 657.20 | Other | 19% ad val. |

The record consists of 907 pages of transcribed testimony from thirteen witnesses; eight for plaintiff; one for defendant and four for the party-in-interest. There are 32 exhibits, numbered for the record as plaintiff's exhibits 1 through 22, defendant's exhibits A–1 through A–4, and party-in-interest ex-

Kane & Koons, Washington, D. C. (Matthew A. Kane, Washington, D. C., of counsel); Lincoln & Stewart, Washington, D. C., (Eugene L. Stewart, Washington, D. C., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for defendant.

Hall & Juarez, Laredo, Tex., Clemens, Knight, Weiss & Spencer, San Antonio, Tex. (George H. Spencer, San Antonio, Tex., of counsel); Locke, Purnell, Boren, Laney & Neeley, Dallas, Tex. (Trevor William Rees-Jones, Dallas, Tex., of counsel), associate counsel; for the party-in-interest.

Before RICHARDSON, LANDIS, and WATSON, Judges.

LANDIS, Judge:

Plaintiff here sues, as an American manufacturer, for relief under section 516, Tariff Act of 1930 (19 U.S.C., section 1516), protesting the tariff classification of articles of the class or kind produced by it, imported from Mexico, and described on the entry invoice as steel plates, specifications ASTM A–285–C, cut and pressed to hemispherical shape. The importer, Guadalupe Industrial Supply Company, Inc., the party-in-interest, appears with defendant in defense of the customs classification of the hemispherical articles under the heading "angles, shapes, and sections", dutiable under the Tariff Schedules of the United States (TSUS) item 609.80, at the rate of 0.1 cent per pound.

Plaintiff contends that hemispherical shaped articles are not within the class of "angles, shapes, and sections" intended to be classified by TSUS and are properly dutiable as articles of iron or steel, not specially provided for in

hibits I through VI. We shall refer to the exhibits where pertinent to our discussion of the facts. At the outset we can say that exhibit 1 consists of the correspondence between plaintiff and customs officials showing compliance with the jurisdictional requirements for an American manufacturer's protest under section 516, *supra*. Exhibit 11 is a sample of the hemispherical article imported in this case. Its inside diameter measures 37 inches. The term "hemispherical" denotes that the shape of the article is that of half a sphere formed by a plane through a sphere's center.

Somewhat crucial, yet undisputed as we read the record, are the facts with respect to the process by which these hemispherical articles were produced by Altos Hornos de Mexico, S. A. Monclova Coahuila. Exhibits, modified in size for convenience in handling, illustrate the changes which took place in the form and shape of the metal used in that process. To start with a rectangular piece of ASTM 285 grade C flat steel plate, produced in a hot rolling process but which, when used, is a piece of plate metal in a cold state or condition (exhibit 2), is cut into a round or circular piece of flat steel plate (exhibit 3). The circular piece of plate is placed in a hydraulic press and the surface of the plate is lubricated to facilitate the pressing process which follows. As the press is engaged, it presses a male die into the circular plate causing the metal to plastically deform into a female die and cold form the hemispherical shape which, when removed from the press, has around its base a horizontal collar or flange (exhibit 4). The flange, which is cut off, has no useful purpose and is discarded as waste or scrap metal. When the lubrication is washed off, the hemispherical article is ready for shipment (exhibit 6).

The issue is whether the imported article, produced in the process described above, is within the class of "angles, shapes, and sections" hot rolled or, cold formed and weighing over 0.29 pound per linear foot, not drilled, not punched, and not otherwise advanced, dutiable under TSUS item 609.80.

Plaintiff argues that a hemispherical article is not within the class of "angles, shapes, and sections" covered by schedule 6, subpart B because Congress intended to limit the term "angles, shapes, and sections" to angles, shapes, and sections produced in a basic steel mill and to exclude articles further advanced in condition by a process of manufacture in a so-called fabricating plant. On this record, we are of the opinion that plaintiff has failed to overcome the presumption of correctness attaching to the customs classification under TSUS item 609.80 and overrule the protest. Kaysing v. United States, 49 CCPA 69, C.A.D. 798 (1962).

There is little or no ground for quarrel with plaintiff's statement that the intrinsic structure of TSUS schedule 6 discloses an intent on the part of Congress to provide a classification system based upon "the state of advancement of metal articles" (plaintiff's brief, page 86). To say that, does no more than recognize that "Schedule 6 provides for a logical arrangement of metals and metal products and takes cognizance of the many developments in metals and metal products since 1930."[1] What we take exception to is plaintiff's contention that the classification in part 2 of schedule 6 provides only for metal in primary forms, including "angles, shapes, and sections", "*produced in basic iron and steel mills*" (plaintiff's brief, page 86, emphasis added).

■ The purpose of part 2, schedule 6, was to cover completely, in an organized systematic manner, the classifica-

---

1. Report of the United States Tariff Commission to the President and the Congress in item volumes entitled Tariff Classification Study, Schedule 6, preface page XII.

tion of base metals.[2]  Subpart B of part 2, schedule 6, covers iron and steel, their so-called basic shapes and forms and in addition covers iron or steel waste and scrap.  It "sets forth in an orderly systematic arrangement the provisions which would apply to * * * [those] products", and, in effect, brings together "the existing provisions * * * set forth in paragraphs 5, 301–317, 319, 322, 327, 328, 335, 389, 397, and 1786" of the Tariff Act of 1930.[3]  An important and new feature of TSUS, not contained in any of the earlier tariff acts, is the system of legal interpretative headnotes intended to clarify the relationships between the various classification descriptions.  The headnotes are in close proximity to the tariff classification to which they relate.  Where the headnotes relate to an entire schedule such as schedule 6, they are schedule headnotes.  When they relate only to a part, such as part 2, they are part headnotes.  Subpart B of part 2, schedule 6, contains its own related headnotes.[4]  There, in subpart B, the relationship of the TSUS classification "angles, shapes, and sections" to the other so-called basic shapes and forms of iron and steel, classified in subpart B, is explained in a legal headnote as follows:

3.  *Forms and Condition of Iron or Steel.*—For the purposes of this subpart, the following terms have the meanings hereby assigned to them:

\*　\*　\*　\*　\*　\*

(b) *Blooms and billets:* Semifinished products generally of rectangular or circular cross section, having a length several times greater than the maximum cross-sectional dimension, and, if rectangular, a width less than 4 times the thickness.  A bloom is at least 36 square inches in cross-sectional area; a billet is less than 36 square inches but not less than 3 square inches in cross-sectional area.

(c) *Slabs and sheet bars:* Semifinished products of rectangular cross section, having a width of at least 4 times the thickness.  A slab is not less than 2 inches and not over 6 inches in thickness; a sheet bar is less than 2 inches in thickness.

(d) *Bars:* Products of solid section not conforming completely to the respective specifications set forth herein for blooms, billets, slabs, sheet bars, wire rods, plates, sheets, strip, wire, rails, joint bars, or tie plates, and which have cross sections in the shape of circles, segments of circles, ovals, triangles, rectangles, hexagons, or octagons.  *Deformed concrete reinforcing bars* are hot rolled steel bars, of solid cross section, having deformations of various patterns on their surfaces.

\*　\*　\*　\*　\*　\*

(f) *Wire rods:* A coiled, semifinished, hot-rolled produce of solid cross section, approximately round in cross section, not under 0.20 inch nor over 0.74 inch in diameter.

(g) *Plates and sheets:* Plates are flat rolled products, whether or not corrugated or crimped, in coils or cut to length, 0.1875 inch or more in thickness and, if not cold rolled, over 8 inches in width, or, if cold rolled, over 12 inches in width.  Sheets are flat rolled products, whether or not corrugated or crimped, in coils or cut to length, under 0.1875 inch in thickness and over 12 inches in width.  For the purposes of this subpart—

(i) the term *"black plate"* refers to cold rolled steel sheets, not coated, under 0.0142 inch in thickness;

(ii) the term *"tin plate and tin coated sheets"* refers to tin coated steel sheets; and

(iii) the term *"terne plate and terne coated sheets"* refers to steel sheets coated with

2.  Tariff Classification Study, Schedule 6, page 87.

3.  Tariff Classification Study, Schedule 6, page 89.

4.  Tariff Classification Study, Submitting Report, page 9.

terne metal (a lead-tin alloy).

(h) *Strip:* A flat rolled product, whether or not corrugated or crimped, in coils or cut to length, under 0.1875 inch in thickness, and, if cold rolled, over 0.50 inch but not over 12 inches in width, or, if not cold rolled, not over 12 inches in width.

(i) *Wire:* A finished, drawn, non-tubular product, of any cross-sectional configuration, in coils or cut to length, and not over 0.703 inch in maximum cross-sectional dimension. The term also includes a product of solid rectangular cross-section, in coils or cut to length, with a cold-rolled finish, and not over 0.25 inch thick and not over 0.50 inch wide.

(j) *Angles, shapes, and sections:* Products which do not conform completely to the respective specifications set forth herein for blooms, billets, slabs, sheet bars, bars, wire rods, plates, sheets, strip, wire, rails, joint bars, or tie plates, and do not include any tubular products.

(k) *Rails:* Hot-rolled steel products, weighing not less than 8 pounds per yard, with cross-sectional shapes intended for carrying wheel loads in railroads; railway, and crane runway applications. Rails may be punched or not punched.

(l) *Joint bars:* Hot-rolled steel products designed to connect the ends of adjacent rails in track. Joint bars are usually punched or slotted.

(m) *Tie plates:* Hot-rolled steel products used to support rails in track, to maintain track gauge and protect the ties. The plates are punched to provide holes for spikes and have one or two shoulder sections as rail guides. [Emphasis quoted.]

As the Tariff Commission reported, the provisions of headnote 3, quoted above, specify the essential differences between the various iron and steel products with regard to their form and condition; most of the provisions are new and were believed to conform to the greatest possible degree with existing trade practices;[5] TSUS items 609.80 through 609.98 covering "angles, shapes, and sections" were derived from paragraphs 304, 305, principally paragraph 312 of the Tariff Act of 1930, but modified substantially to take care of valid objections raised at the public hearing in connection with TSUS, and in TSUS items 609.80 through 609.98, and the related provisions in TSUS items 652.90 through 652.98,[6] schedule 6, part 3, subpart F, existing customs practices were reflected without significant change.[7]

■■ The cardinal rule of interpretation in customs classification, as plaintiff states in its argument that a hemispherical article is not an angle, shape, or section, is to give effect to the mani-

---

5. Tariff Classification Study, Schedule 6, page 90.

6.

    Hangars and other buildings, bridges, bridge sections, lock-gates, towers, lattice masts, roofs, roofing frameworks, door and window frames, shutters, balustrades, columns, pillars, and posts, and other structures and parts of structures, all the foregoing of base metal:

    Of iron or steel:
    Door and window frames:
    652.90      Of stainless steel .......
    652.92      Other ................
    Columns, pillars, posts, beams, girders, and similar structural units:

|  | Not in part of alloy iron or steel: | | |
|---|---|---|---|
| 652.93 | Cast-iron (except malleable cast-iron) articles, rough or advanced .......... | | |
| 652.94 | Other ............. | | |
|  | In part of alloy iron or steel: | | |
| 652.95 | In part of stainless steel ............ | | |
| 652.96 | Other ............. | | |
| 652.98 | Other ..................... | | |

7. Tariff Classification Study, Schedule 6, pages 94, 95.

fest congressional intent (plaintiff's brief, page 85). That rule assumes the tariff meaning is not manifest, or is unclear, and requires construction, Block, Temporary Administrator for Estate of Louis S. Fryer v. United States, 42 CCPA 217, C.A.D. 596 (1955). Plaintiff's difficulty is that it has gone astray midst judicial rules of construction for arriving at what Congress intended when it is not manifest, United States v. Lansen-Naeve Corp., 44 CCPA 31, C.A.D. 632 (1957); United States v. Damrak Trading Co., Inc., 43 CCPA 77, C.A.D. 611 (1956), and asks us to follow. We cannot follow because argument, as to the meaning of a tariff term, must end when the intent of Congress is manifest as it is here in the general meaning assigned to the term "angles, shapes, and sections" in subpart B, headnote 3, *supra*. The assigned meaning is simple, clear, (no one argues it is not) and qualified only in its relationship to the meaning assigned to the other basic shapes and forms. To construe the term as limited to "shapes" processed in a basic steel mill, as plaintiff contends, would abort the legal meaning Congress assigned for initial test of a "shape". Cf. First National Bank in Plant City, Fla. v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). It may be, and it probably is true, that most of the metal forms classified in part 2, subpart B, including structural shapes, hot rolled and weighing over 0.29 pound per linear foot, not drilled, not punched, and not otherwise advanced, are predominately the products of the integrated basic steel operations diagramed in T. D. Downing Co. v. United States, 60 Cust.Ct. 345, C. D. 3386, 282 F.Supp. 801 (1968). But TSUS also classifies cold formed metal "shapes". There is no proof that cold formed metal "shapes" are exclusively produced in basic steel mills. As a matter of fact, it is not clear that basic steel mills produce any cold formed "shapes". We also note that the "shapes" classified in paragraph 304 of the 1930 Act, "shapes" which the TSUS history tells us are classified somewhere in TSUS

items 609.80 through 609.98, were not all products of the integrated basic steel industry but "shapes", processed from steel produced in basic steel mills, not advanced beyond stamping as specified in paragraph 304. Kuyper & Co. v. United States, 5 Ct.Cust.Appls. 175, T.D. 34253 (1914); Pistorino & Company, Inc. v. United States, 61 Cust.Ct. 100, C.D. 3538, 287 F.Supp. 978 (1968).

Nor do we propose, as plaintiff suggests, to become involved in a face off to determine the winner between the meaning assigned the term "angles, shapes, and sections" in TSUS, and the meaning assigned to the same term in the notes to Chapter 73 of the so-called "Brussels Nomenclature", which *inter alia* excludes shapes of a cross section in the form of a circle or segments of a circle. As we have said before, we are bound by the specific words of the statute. Morganite, Inc. v. United States, 62 Cust.Ct. 387, C.D. 3778 (1969). Indeed, much of what we said in *Morganite*, on the construction of TSUS terms, is equally applicable to plaintiff's arguments in this case. The Tariff Commission report, that it believed the classifications in part 2, subpart B, conformed to the greatest possible degree with existing trade practices, expresses no opinion on the scope of that trade and the greatest possible degree implies that the classifications may not conform in every degree. TSUS having assigned its own meaning to the term "angles, shapes, and sections", the testimony of plaintiff's witnesses and the supporting argument, on the commercial meaning of the term in the integrated basic steel industry producing angles, shapes, and sections, is factually irrelevant. Evidence of the products that the integrated basic steel industry catalogue under that term (exhibits 9, 10, 12), and the products that are sold under that TSUS term (exhibit 16), is also irrelevant for the same reason.

We hold, the record does not establish nor is there argument to the contrary, that a hemispherical-shaped metal is a "shape" which does not conform com-

pletely to the respective specifications set forth for the other products to which meanings are assigned in headnote 3, *supra*. The testimony variously describes the process of forming the "shape" as a pressing or cold forming operation. Plates, a flat rolled product (headnote 3, *supra*), "pressed * * * to nonrectangular shape" are classified in TSUS items 609.12 through 609.15. Pressing, "[i]n metalworking, [is] the product or process of shallow drawing sheet or plate." [8] Forming, is "[m]aking a change, with the exception of shearing or blanking, in the shape or contour of a metal part without intentionally altering the thickness." [9] Cold working is the process of [d]eforming metal plastically at a temperature lower than the recrystallization temperature." [10] Drawing is the "[f]orming [of] recessed parts by forcing the plastic flow of metal in dies." [11] This hemispherical shape was processed from steel plate but, as we look at it, it is not shallow drawn, it is deep drawn. A hemispherical shape is a nonrectangular shape, but when deeply recessed it is more than flat rolled plate "pressed" in the sense defined above. We conclude, as the evidence establishes, that the hemispherical product in this case is a "cold formed" shape.

Much of the evidence in the record is directed to the specification "weighing over 0.29 pound per linear foot" with respect to "shapes" classified in TSUS item 609.80. The imported hemispherical shape is greatly in excess of that minimum weight. The point, sharply tested on trial, was whether it had a measurable weight per linear foot. The question is of substance because while the superior heading "angles, shapes, and sections" cannot be enlarged by the weight specification indented under it, it can be and is specifically limited thereby.[12] Plaintiff introduced testimony that a weight per linear foot could

only be determined on "angles, shapes, and sections" of uniform cross section throughout their length and introduced illustrative exhibits 18, 19, and 20 in support thereof. The witnesses who so testified were of the opinion that a hemispherical shape does not have a uniform cross section because of its arc and the variation in thickness of the metal. Defendant adduced testimony that a hemispherical shape has a uniform cross section, measurable per linear foot, if cut radially; that all "shapes" vary in thickness within tolerances, and introduced exhibits A–1 through A–4 to illustrate how radial cuts would produce uniform cross sections. Party-in-interest introduced exhibit VI to show that the specifications for steel shapes provided for in ASTM (American Society for Testing Materials) allow "Permissible Variations in Cross-Section [thickness] For Standard Beams, Standard Mill H-Beams, and Channels" all of which are concededly "shapes". Here again, we note that the meaning assigned to the term "angles, shapes, and sections" in TSUS does not specify a uniform cross section. On a question of the weight specification in TSUS item 609.80, submitted to the House Ways and Means Committee of Congress, the Tariff Commission reported as follows:

> * * * The weight break of 0.29 pounds per linear foot substantially reflects the current customs practice with respect to the determination of whether imported steel angles, shapes, channels, sections, etc., should be classified in paragraph 312 (articles weighing over 0.29 lbs./lin. ft.) or paragraph 304 (articles weighing over 0.29 lbs./lin. ft.). Plasterers' furring channel at the present time falls into paragraph 312, from which item 609.-80 in the proposed schedules is drawn, and therefore the weight break between items 609.80 and 609.88 accu-

---

8. Metals Handbook, Volume 1, 8th edition, published by the American Society of Metals (1961), at page 29.

9. Id., at page 18.

10. Id., at page 9.

11. Id., at page 13.

12. General Headnotes and Rules of Interpretation, 10(c) (i). Schedule 6, subpart B, superior heading to TSUS item 609.-80.

rately reflects present practice with respect thereto. [Tariff Classification Study, First Supplemental Report, page 50.]

In the Tariff Classification Study, Seventh Supplemental Report, the Tariff Commission subsequently stated and reported as follows:

During the course of the tariff classification study, the Commission has had occasion from time to time by correspondence and otherwise to express its intention with respect to the scope of certain provisions. The following summarization of some of these expressions is included as supplementary explanatory material for clarification purposes.

\* \* \* \* \* \*

Items 609.80–.90— *Angles, shapes, and sections of iron or steel.* The provisions for angles, shapes, and sections contemplates products of uniform cross-section throughout their length. \* \* \* [Pages 99, 102.]

Assuming that the TSUS term "angles, shapes, and sections weighing over 0.29 pounds per linear foot" contemplates products of uniform cross section, the evidence of record is conflicting as to whether the imported hemispherical shapes do or do not have uniform cross sections. Except in its analysis of the record and reference to exhibits 18, 19, and 20, and perhaps for the reason that the evidence is conflicting, plaintiff does not argue or score the point in its brief. The presumption that the imported hemispherical shapes meet the TSUS weight specification has not, therefore, been overcome.

This brings us to summarize the facts upon which plaintiff relies to support its argument that the TSUS term "angles, shapes, and sections" was intended to classify a product shaped for general use as material and excludes a shaped article dedicated or chiefly used as a part, to wit, tank ends for pressure containers. As we shall discuss, we do not believe

that either of those propositions is particularly sound in the context of the TSUS classification of angles, shapes, and sections.

The record supports the fact that the imported metal hemispherical-shaped articles are chiefly used as end closures on pressure containers, designed and used for the storage of compressed gases. They may and apparently do have other incidental uses, but this does not alter the fact that they are primarily used as tank ends on pressure containers. The domestic industry in metal hemispherical shapes makes and sells them by the commercial designation "hemispherical heads" or an abbreviated version of that term (exhibits 7, 8, 21, 22; collective exhibits 14, 15, 16, 17). Some of the witnesses also referred to the hemispherical shapes as tank ends and tank closures. That they are called "hemispherical heads" in the trade does not necessarily prevent their classification as a "shape", cf. United States v. Frank, 15 Ct.Cust.Appls. 97, T.D. 42184 (1927). In TSUS "emphasis [was] placed on the development and use of objective standards for making product distinctions, and dependency on commercial designation \* \* \* considerably reduced." [13]

Pressure containers are required to be made of what is known in the industry as code grade steel. Code grade steel is that specified by the American Society for Testing Materials (ASTM) for particular purposes. A–285–C grade steel plate, from which the imported hemispherical shapes (hereinafter also called heads) were cold formed, is one of several grades prescribed by the code for pressure containers. Hemispherical heads with a 37-inch inside diameter are also one of several standard diameters in which hemispherical heads are made to accommodate different size pressure containers. Plaintiff, in the introduction to its catalogue (exhibit 8), professes to have pioneered the industry in cold formed heads and also led the industry in standardizing diameters. In the same

13. Tariff Classification Study, Submitting Report, page 16.

catalogue, plaintiff states that it carries an endless variety of standard shapes in its die bank for all applications, including a die or dies for a hemispherical shape, with a 37-inch inside diameter, without flange, that has a depth one-half that of its diameter (pages 3A, and 3A–14). A pressure container consists principally of a shell, fittings, valves, and end closures.

■■ The above facts having been established, we now discuss why we believe plaintiff's argument, directed to the dedication or chief use of hemispherical heads as "parts" of pressure containers is misplaced in the context of the TSUS classification of angles, shapes, and sections cold formed, not drilled, not punched, and not otherwise advanced. The TSUS classification, "metal pressure containers designed and used for the transport and storage of compressed gases" (see TSUS item 640.10, referred to by plaintiff) does not provide for parts. The TSUS term "angles, shapes, and sections", which generically applies to a variety of shapes, United States v. Frank, supra, is not controlled by what, in this case, the shape is chiefly used for but by the degree to which it has been advanced toward any use. If the TSUS classification for metal pressure containers provided for "parts" thereof, we would be sorely tested to decide whether the classification of the hemispherical shape under the tariff description "angles, shapes, and sections", not "advanced" should prevail as a specific provision for the part.[14] See, West Coast Glass Distributors v. United States, 62 Cust.Ct. 444, C.D. 3797, 298 F.Supp. 1188 (1969). But we are not put to decide that question by the customs classification as a "shape" not advanced, and plaintiff's claim that it is an article of iron or steel, not specially provided for. All we must decide, as between those classifications, is whether

the generic term "angles, shapes, and sections", not "advanced" is relatively more specific for these hemispherical shapes, in the condition imported, than is the general provision for articles of iron or steel, not specially provided for. The same question of advancement as distinguished from the chief use of the article, came up in Pistorino & Company, Inc. v. United States, 61 Cust.Ct. 100, C.D. 3538, 287 F.Supp. 978 (1968). In Pistorino this court had to decide which tariff classification was relatively more specific for a stamped shape for use as a latch needle, the classification as stamped shapes, not advanced, or that for "latch needles". The second division there held that "a provision [stamped shapes, not advanced] for a basic form of an article need not always yield to the provision for the finished article [latch needles]", even though the "shape" was dedicated to be made into a latch needle. Plaintiff, unsuccessfully we think, tries to distinguish Pistorino from the facts in this case on the ground that the shape in Pistorino was an "unfinished" article while the shape, it contends, in this case is a "finished" article and need only be fitted to the tank body. A shape "can, of course, be finished, if by that we mean that the shape of the article has dedicated it to a particular use. The same shape can be unfinished, if by that we mean that, aside from its shape, the article has not been advanced toward the dedicated use. Classification issues are best decided, indeed, must be decided within the relative terms of the competing tariff classifications raised by the protest. "Unless the context requires otherwise, a tariff description for an article covers such article, * * * whether finished or not finished."[15] There is no tariff description in TSUS describing articles by the name hemispherical shapes or hemispherical heads. To say alternately, as plaintiff seems to

---

14. General Headnotes and Rules of Interpretation, 10(ij).

15. TSUS, General Headnotes and Rules of Interpretation, 10(h). J. Gerber & Co.,

Inc., et al. v. United States, 62 Cust.Ct. 368, C.D. 3773, 298 F.Supp. 516 (1969), appeal pending.

in its brief, that the imported shape is "advanced" because it is a "part" "dedicated" to a particular use, that the shape in *Pistorino* was "unfinished" because it was not "advanced", and that the imported shape is "finished" because it is "dedicated" to a particular use and only has to be fitted to the tank of which it is a "part", means nothing when not connected to the viable context of the disputed and claimed classifications before the court. It confuses the real issues, and when judicial principles are introduced to support propositions not before us, the confusion is compounded.

We read TSUS to concede that the term "angles, shapes, and sections" may apply to articles finished in the sense that their shape and size dedicate them to a particular use or, minimally, dictate what they can be used for and, therefore, to classify them by the degree to which they have been advanced toward any use. Unless such a literal interpretation is placed upon the relevant classifying terms, the distinction between angles, shapes, and sections "not drilled, not punched, and not otherwise advanced", in TSUS item 609.80, and angles, shapes, and sections "drilled, punched, or otherwise advanced", in TSUS item 609.84, is meaningless. United States v. Baron Tube Co., John S. James, 47 CCPA 69, 72, C.A.D. 730 (1960). The term occupies the same middle ground that Chief Judge Rao spoke of in *Pistorino,* relative to the stamped steel shapes, not advanced, in paragraph 304 of the 1930 Act, when he said:

> * * * The provision for stamped shapes appears to occupy an undefined middle ground between raw materials and unfinished products. If the stampings are the basic material for manufacturing processes and are not dedicated to any one particular use, there has been no hesitation to place them squarely within paragraph 304. United States v. Frank, 15 Ct.Cust. Appls. 97, T.D. 41284, Summerfield's (Inc.) v. United States, 59 Treas.Dec.

1164, T.D. 44890. Conversely, if the stamping process produces an article, which possesses the character of a finished article, it will be classified under the provision which best suits the finished article. Wm. E. Flory & Co. v. United States, 45 Treas.Dec. 244, T.D. 40042, Kilian Manufacturing Corporation v. United States, 24 Cust.Ct. 455, Abstract 54322. Moreover, the wording of the statute removes from its ambit stampings which have been advanced in any manner. Thus the sole difficulty is in dealing with unadvanced stampings which have been dedicated to use as specified articles or parts. [61 Cust. Ct. 113, 287 F.Supp. 988.]

On the question of advancement, the only viable issue we see in this case is are these hemispherical shapes advanced beyond being cold formed. We have reviewed the cases, cited by plaintiff, in which issue as to a shaped article was, *inter alia,* raised. Two of the cases were decided in the context of a classification which simply provided for "stamped shapes", without limitation as to their advancement. United States v. Prosser, 1 Ct.Cust.Appls. 22, T.D. 30848 (1910); Lunham & Moore v. United States, 2 Ct.Cust.Appls. 1, T.D. 31569 (1911). TSUS, in this case, classifies "shapes" formed by various processes, "not otherwise advanced". The balance of the cases cited by plaintiff, involving classification of stamped shapes, *inter alia,* not advanced in condition by any process subsequent to the process of stamping, quite simply decided that the imported article before the court was advanced, Braun-Steeple Co. et al. v. United States, 18 CCPA 437, T.D. 44683 (1931), sheets of steel advanced in condition by stamping with various designs; Timber Engineering Company, Inc. v. United States, 22 Cust.Ct. 1, C.D. 1148 (1948), sheared strips of steel, cut to length, tongued and grooved, and advanced in three or four pressing operations which formed each length into a circle or ring; Kilian Manufacturing Corporation v. United States, 24 Cust.Ct.

455, Abstract 54322 (1950), steel strips stamped to a shape advanced by being "sized, [or] trued up on another press."

Plaintiff here contends that the "nature of the processing to which the imported article [hemispherical shape] is subjected, which includes the observance of a particular inside diameter, the creation of the hemispherical configuration in the article, and the trimming of the flange from the base, the necessary step which makes the article ready for immediate use as a tank head" (plaintiff's brief, page 106), all of which are claimed to have brought it to the state where it possesses the character of a finished article dedicated to a particular use, advanced the hemispherical shape beyond the condition of a basic "shape". When we rule out, as we have already done, the principle of dedication to use or chief use for determining when an article is advanced, what plaintiff seems to be saying is that the very process by which this hemispherical shape was produced is an advancement. To paraphrase what the court of appeals said in Baron Tube Co. et al., *supra,* no step required for the creation of a shape can, at the same time, be an advancement of the shape under the same classification. Within that principle, the only possible advancement we are able to discern in the process of cold forming a hemispherical shape is the trimming of the flange. The record establishes that it is common in the steel industry to cut off useless excrescences from steel shapes incident to making them merchantable and fit for shipment. That, according to the record, is the reason the flange is cut off the imported hemispherical shape. Cutting off the flange is not an advancement. American Mannex Corp. v. United States, 56 Cust.Ct. 31, C.D. 2608 (1966), in the sense referred to in TSUS. Advancement, in our opinion, would involve "modifications * * * made after initial forming", such as those where "[f]langes can be toed-in, joggled or machined; holes can be pierced or flame cut for manhole, spud or other openings" referred to in the organization of contents, section 1, of exhibit 8, and in invoice orders which specified a center hole in the hemispherical head (collective exhibit 17).

Upon consideration of the relevant facts and judicial principles discussed above, we hold that plaintiff has failed to overcome the presumption that customs correctly classified the hemispherical heads as shapes, not otherwise advanced, under TSUS item 609.80. The protest is, therefore, overruled.

Judgment will be entered accordingly.

RICHARDSON and WATSON, JJ., concur.