(C.D. 3778)

MORGANITE, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 14, 1969)

*Rode & Qualey* for the plaintiff.
*William D. Ruckelshaus,* Assistant Attorney General (*Arthur H. Steinberg* and *Steven R. Sosnov,* trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: The merchandise of plaintiff's protest was manufactured in England and entered at the port of New York.

The parties agree that the protest items are shaped refractory and heat-insulating articles, not specially provided for, described in TSUS schedule 5, part 2, subpart A. The question in main is whether, under that general classification, they are porcelain refractory articles specified in TSUS item 531.37, dutiable at 45 per centum ad valorem,

as classified and assessed by defendant. Plaintiff claims that the articles are not porcelain refractories and should be dutiable at only 15 per centum ad valorem, under catch-all TSUS item 531.39 for all other refractory articles.

The issue, as we see it, comes down to a question of definition as to what the term "porcelain" embraces in the tariff schedules.

The articles are invoiced as pyrometer sheaths, cylindrical crucibles, combustion boats, tubes O.B.E., solid rods and insulating tubes, and are grouped on the invoice under the manufacturer's designation "TRIANGLE RR (RE-CRYSTALLISED ALUMINA)".

On trial, plaintiff introduced exhibits illustrative and representative of the articles imported (exhibits 1 to 5), along with a catalogue, price list, brochure, and a number of illustrative photographs (exhibits 6 to 11). While informative, the exhibits are not particularly helpful on the issue of what the term "porcelain" embraces. The testimony is likewise sharply divided in opinion as to whether the imported articles are embraced in the term "porcelain", first, as defined in dictionaries and other manuals and, second, as defined in schedule 5, part 2. There is no need to recount those differences. It goes without saying, that most of the differences stem from different premises. What we are primarily interested in are the facts. It is our task to decide how the facts fit the tariff schedules. As we read the record, the relevant and material facts are undisputed.

The facts which we consider relevant, namely, how the imported articles were manufactured and out of what material or materials, can be briefly summarized. Mr. Francis Aldred, director and general manager of Morgan Refractories, Limited, a subsidiary of the Morgan Crucible Company, which produced the imported articles, testified that:

> The raw material [used to produce the imported articles] is aluminum oxide, known in the trade as calcined alumina, which is prepared for the manufacture of aluminum metals. We purchase this and process it ourselves to a specified particle size and also carry out chemical treatment and further purification on it. We then take this prepared powder and shape articles from it in several different ways depending on the article to be produced. * * *
>
> · * * * * * * *
>
> * * * Exhibits 3 and 2 are slip-cast and Exhibits 1, 4, and 5 are extruded. We also manufacture by pressing. In each case it is necessary to add to the raw material binders and other agents to assist in the shaping. These are carefully chosen so that they are volatile or organic so that on heat treatment there is no residue of significance in the finished article. After shaping, the pieces are heated to remove these volatile and organic binding agents and are then subsequently kilned to a high temperature which produces the ware as in evidence. [R. 29.]

He stated that no clay or fluxing material is used with the alumina oxide to produce the imported articles which are, essentially, composed of recrystallized alumina and which are better than 99.7 percent alumina oxide. This, according to Witness Aldred, is about as pure as alumina can be commercially and practically produced. He further stated that the imported articles were not produced in a process of vitrification but out of a process known as solid state sintering. (R. 40.)

The parties have additionally stipulated that the American Society for Testing Materials (ASTM) defines "Alumina Porcelain" as "A vitreous ceramic whiteware for technical application in which alumina ($Al_2O_3$) is the essential crystalline phase." (R. 38.)

On cross-examination of Witness Aldred, defendant's counsel established that the raw material alumina oxide was ground or beneficiated in order to produce the imported articles; that the articles have been shaped; that they are of a wholly crystalline structure; that alumina is an inorganic nonmetallic substance, and that the imported articles were formed and subsequently hardened by heat treatment.

The pertinent terms, "ceramic article" and "porcelain", and related terms which point up the distinctions between the various terms, are defined in schedule 5, part 2, as follows:

Part 2. – CERAMIC PRODUCTS

Part 2 headnotes:

\*          \*          \*          \*          \*          \*          \*

2. For the purposes of the tariff schedules—

(a)   a "*ceramic article*" is a shaped article having a glazed or unglazed body of crystalline or substantially crystalline structure, which body is composed essentially of inorganic nonmetallic stubstances and either is formed from a molten mass which solidifies on cooling, or is formed and subsequently hardened by such heat treatment that the body, if reheated to pyrometric cone 020, would not become more dense, harder, or less porous, but does not include any glass article;

(b)   the term "*earthenware*" embraces ceramic ware, whether or not glazed or decorated, having a fired body which contains clay as an essential ingredient and will absorb more than 3.0 percent of its weight of water;

(c)   the term "*stoneware*" embraces ceramic ware whether or not glazed or decorated, having a fired body which contains clay as an essential ingredient, is not commonly white, will absorb not more than 3.0 percent of its weight of water, and is naturally opaque (except in very thin pieces) even when fully vitrified;

(d)   the term "*subporcelain*" embraces fine-grained ceramic ware (other than stoneware), whether or not glazed or decorated, having a fired body which is white (unless artificially colored) and will absorb more than 0.5 percent but not more than 3.0 percent of its weight of water;

(e)  the terms *"chinaware"* and *"porcelain"* embrace fine-grained ceramic ware (other than stoneware), whether or not glazed or decorated, having a body which is white (unless artificially colored) and will not absorb more than 0.5 percent of its weight of water;

\*    \*    \*    \*    \*    \*    \*

(i)  the term *"fine-grained"*, as applied to ceramic wares, embraces such wares having a body made of materials any of which had been washed, ground, or otherwise beneficiated; and

\*    \*    \*    \*    \*    \*    \*

(k)  the water absorption of a ceramic body shall be determined by ASTM test method designated C373–56 (except that test specimens may have a minimum weight of 10 grams, and may have one large surface glazed).

Plaintiff cites a number of authorities defining the term "porcelain" somewhat at variance with the TSUS definition, *supra*. We, just the same, "are bound by the specific words of the statute." *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735. The real thrust of plaintiff's brief, constantly reverted to in each point, is the argument that the authorities "clearly indicate that an essential ingredient of porcelain is clay" (plaintiff's brief at page 14). On this record, the imported articles do not, of course, contain any clay. However, the term "porcelain" and the term "ceramic article", as defined in TSUS schedule 5, make no mention of clay. We can only conclude, therefore, that, although a product containing clay is not excluded, clay is not an "essential ingredient" of the porcelain embraced in TSUS schedule 5. The more so when we consider that when clay was intended to be an "essential ingredient", it was carefully made part of the definition as in part 2 headnotes (b) and (c) defining earthenware and stoneware, *supra*.

Plaintiff plays on the term "ceramic", with the statement that nowhere is it defined in the tariff schedules headnotes. We are unable to follow plaintiff's point. To say that the term "ceramic article", as defined in TSUS schedule 5, is an effort to state what is meant to be included and excluded from the term but does not define the term "ceramic," is, at best, an exercise in semantics.

As reported to the President and to the Congress in the 1960 Tariff Classification Study, preliminary to the adoption of the tariff schedules as the law of the United States:

> The term "ceramic article", as used and defined in schedule 5, has a meaning differing only slightly from the classical definition of the word. It covers primarily refractory products, ceramic construction products, and pottery and related products, all of which have long been concerned with the use of clay. *Because of changing technology, however, many ceramic products are made without clay, for example, pure oxide articles*, devitrified glass

articles, and some cermets. The tariff status of nonclay ceramics has been uncertain. In 1956 certain of these wares were classified in paragraph 214 as manufactured earthy or mineral substances not specially provided for (CIE 122/56). However, this ruling was soon revoked and it became the practice to classify such articles under paragraph 212 as "other vitrified wares" * * *.

\*  \*  \*  \*  \*  \*  \*

The definition of "ceramic articles" specifically excludes any glass article from its scope. The primary distinction between the ceramic articles of part 2 and glass articles of part 3 is that glass is essentially noncrystalline in structure whereas *ceramic ware is essentially crystalline.* It is true, of course, that opalescent glass does have small quantities of finely divided crystals but they are not present in sufficient amount to present any serious problem. *Ceramic articles have a body which is substantially crystalline.* A recent development in the ceramic field concerns devitrified glass articles presently made by patent process and sold under the trade name "Pyroceram." This product is essentially crystalline in structure, but it is formed by a glass-making process. It is largely for this reason that the definition in headnote 2(a) shows that a ceramic article may be "formed from a molten mass which solidifies on cooling". Of course, the more usual technique is for a ceramic article to be formed and subsequently hardened by heating at high temperature.

Headnote 2 also defines the terms "earthenware" "stoneware", "subporcelain", "chinaware", "porcelain", "bone chinaware", "non-bone chinaware", "coarse-grained", "fine-grained", and "body". Rate differences on products covered by the existing provisions of paragraphs 210, 211, 212, and 214 are based on the various product distinctions involved. *The definitions are aimed at expressing these distinctions more clearly than they are expressed in the existing tariff provisions.*

The definitions of "earthenware", "stoneware", "subporcelain" ("semiporcelain", as published), "chinaware" and "porcelain" have all been modified uniformly to make it clear that they embrace ware, whether or not glazed or decorated, having a *fired body.* As is explained below in connection with subpart D, the reference to "decorated" is not meant to suggest that these products must be susceptible of decoration. These definitions and additional modifications made to some of them are explained in the following paragraphs.

\*  \*  \*  \*  \*  \*  \*

Paragraph 212 covers "china, porcelain, and other vitrified wares, * * * composed of a vitrified nonabsorbent body which when broken shows a vitrified, vitreous, semivitrified, or semi-vitreous fracture". Accumulated evidence clearly establishes general agreement that china and porcelain are fully vitrified. *This concept is reflected in the definition of the American Society for Testing Materials (ASTM) which states that the body of china and porcelain will not absorb over 0.5 percent of its weight of water (see headnote 2(e)).* The provision for "other vetrified

wares" has been uniformly applied by customs officers to ceramic ware (other than china and porcelain) the body of which will not absorb over 3.0 percent of its weight of water. The term "subporcelain" is used here to describe that hard-fired, but not fully vitrified, ware, and seems to be a logical term to designate that ware which is between earthenware and chinaware with respect to its degree of vitrification (absorptivity).

*The terms "chinaware" and "porcelain" which are defined in headnote 2(e), cover not only standard wares containing clay, but also articles of special porcelains such as alumina porcelain,* cordierite porcelain, steatite porcelain, titania porcelain, and others. Such special porcelains are recognized by the ASTM. The terms, however, do not include those ferrite and other articles the bodies of which are not white.[1] These, like "subporcelain" are "other vitrified wares" if the absorption is not over 3.0 percent.

The word "vitrified" now in paragraph 212 has been purposely omitted from the proposed definitions because, although for many years the process of vitrification has been recognized as the gradual elimination, by heat treatment, of absorptivity or apparent porosity, whether by glass formation *or by solid phase reaction between crystals,* dictionary definitions of the word "vitrify" refer only to the glassy phase. Following such definitions, it might be reasoned that an article without glassy phase, such as some of these special ceramic wares, could not be vitrified. *In the interest of clarity and consistent with practice, the proposed definition relies on the objective test of water absorption.* [Emphasis added. Tariff Classification Study, 1960, Schedule 5, Part 2 at pages 77, 78, and 80.]

We find not a bit of evidence that the imported articles are other than porcelain refractory articles, as defined in TSUS schedule 5. Indeed plaintiff's witness Aldred virtually conceded that, within the limits of his own expertise, the imported articles conform to the tariff schedule definitions of "ceramic article" and "porcelain" except that, in his view, "the word 'ceramic' is normally understood to be a [product of] material which incorporates clay." (R. 68, 69, 70.)

As we know from the Tariff Classification study, *supra,* the presence of clay in an article is not the test of what is or is not porcelain for tariff purposes and essentially, "[i]n the interest of clarity and consistent with practice, the * * * definition relies on the objective test of water absorption."

Plaintiff has failed to overcome the presumption that defendant correctly classified the imported articles under TSUS item 531.37. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States, supra.* The protest is overruled.

Judgment will be entered for defendant.

---

[1] White-bodied wares are those which, unless artificially colored, are very light in color. They may be gray-white, cream-white, or ivory-white, but not so dark as to be buff colored or gray.