**KLOCKNER INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 84–3–00388.**

United States Court of International Trade.

July 6, 1984.

Wayne Jarvis, Ltd., Chicago, Ill., Wayne Jarvis and Michael G. Hodes, Chicago, Ill., at the trial and on the brief, for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, New York City (Kenneth N. Wolf, New York City, at the trial and on the brief), for defendant.

FORD, Judge:

This action involves the importation of eleven different types of hot rolled carbon steel sections imported from the Federal Republic of Germany. Eight of these sections are used in the manufacture of rims for wheels of off-highway vehicles. The remaining three types are utilized in the manufacture of hinges for doors of vans and trucks. The merchandise was denied entry since it was accompanied by neither an export certificate issued by the European Coal and Steel Community (ECSC) nor a Special Summary Steel Invoice (SSSI).

The export certificate is required by an "Arrangement", entered into by the ECSC and the United States, which was published in the Federal Register, Vol. 47 p. 49058 *et seq.* The list of so-called "Arrangement Products" set forth *infra* includes, among other products, those subject to classification under Item 609.80(45) of the Tariff Schedules of the United States, which is the classification involved herein. The Special Summary Steel Invoice is required by Customs Regulations, 19 C.F.R. § 141.-89(b)(2)(i)(3).

The Tariff Schedules of the United States, Schedule 6, Part 2, provide as follows:

> Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, or drawn, or cold formed or cold finished, whether or not drilled, punched, or otherwise advanced; sheet piling or iron or steel;
> Angles, shapes, and sections:
> Hot rolled; or, cold formed and weighing over 0.29 pound per linear foot:
> Not drilled, not punched, and not otherwise advanced:
>
> 609.80      Other than alloy iron or steel ..............0.9% ad val.
> Having a maximum cross-sectional dimension of 3 inches or more:
> Wide flange shapes or sections:
> H–piles

```
                    Other
                  Other:
                    Angles
                    Chanels
609.8045            Other
```

Angles, shapes, and sections, all the foregoing, of iron or steel, hot rolled, forged, extruded, or drawn, or cold formed or cold finished, whether or not drilled, punched, or otherwise advanced; sheet piling of iron or steel:

Angles, shapes, and sections:
Hot rolled; or, cold formed and weighing over 0.29 pound per linear foot:
Drilled, punched, or otherwise advanced:

609.8400    Other than alloy iron or steel ...............5.5% ad val.

Tariff Schedules of the United States, Schedule 6, Part 2:

*Subpart B headnotes:*

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

\*      \*      \*      \*      \*      :

3. *Forms and Conditions of Iron or Steel.*—For the purpose of this subpart, the following terms have the meanings hereby assigned to them:

\*      \*      \*      \*      \*      \*

(j) *Angles, shapes, and sections:* Products which do not conform completely to the respective specifications set forth herein for blooms, billets, slabs, sheet bars, bars, wide rods, plates, sheets, strip, wire, rails, joint bars, or tie plates, and do not include any tubular products.

General Headnotes and Rules of Interpretation, TSUS:

2. *Customs Territory of the United States.* The term "customs territory of the United States", as used in the schedules, includes only the States, the District of Columbia, and Puerto Rico.

19 C.F.R. § 141.89(b)(2)(i)(3):

(b) Special Summary Steel Invoice.

(1) A Special Summary Steel Invoice (Customs Form 5520) shall be filed in duplicate at the time of filing the entry summary for each shipment which is determined by the district director to have an aggregate purchase price of $10,000 or over or, if from a contiguous country, of $5,000 or over, including all expenses incident to placing the merchandise in condition packed ready for shipment to the United States, and which contains any of the articles of steel listed in paragraph (b)(2) of this section. In addition to the information required by § 141.86, the Special Summary Steel Invoice shall set forth the following:

(A) The date price terms were agreed upon (the date of agreement on the final sales price for the shipment).

(B) Description and cost of extras (a description of, and the additional price charged for, extras, other than width and length, with extras described in terms understood in the United States market).

(C) American Iron and Steel Institute (AISI) category.

(D) Base price (the base price for each steel category on which the total sales price was based).

(E) The name of the producer, the importer, and the price paid by the first unrelated purchaser in the United States, if that price is available at the time of filing the entry summary. One or more continuation sheets may be used to supply this information, if necessary.

(2) The following articles of steel are subject to the special invoice requirements of § 141.89(B)(1):

(i) Category Number and Products:

\*      \*      \*      \*      \*      \*

(3) Structural Shapes, plain 3 inches and over.

19 U.S.C. Section 81c:

**Admission of foreign merchandise into zones without regard to customs laws; treatment; shipment into customs territory; appraisal; reshipment**

Foreign and domestic merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States except as otherwise provided in this Act [19 USCS §§ 81a et seq.] be brought into

a zone and may be stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this Act [19 USCS §§ 81a et seq.], and be exported, destroyed, or sent into customs territory of the United States therefrom in the original package or otherwise; but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise.

19 U.S.C. § 1626 provides:

**(a) Export validation requirement**

In order to monitor and enforce export measures required by a foreign government or customs union, pursuant to an international arrangement with the United States, the Secretary of the Treasury may, upon receipt of a request by the President of the United States and by a foreign government or customs union, require the presentation of a valid export license or other documents issued by such foreign government or customs union as a condition for entry into the United States of steel mill products specified in the request. The Secretary may provide by regulation for the terms and conditions under which such merchandise attempted to be entered without an accompanying valid export license or other documents may be denied entry into the United States.

**(b) Period of applicability**

This section applies only to requests received by the Secretary of the Treasury prior to January 1, 1983, and for the duration of the arrangements.

19 U.S.C. § 1626 was added at § 153 to Pub.L. 97–276 on October 2, 1982.

The following information is contained in the "Arrangement", published in the Federal Register, Volume 47, No. 210, October 29, 1982:

Appendix II

The following product definitions are taken from the last published Federal Register notice of a determination in the cases subject to this note of termination.

1. The term *"carbon steel structural shapes"* covers hot-rolled, forged, extruded, or drawn, or cold-formed or cold-finished carbon steel angles, shapes, or sections, not drilled, not punched, and not otherwise advanced, and not conforming completely to the specifications given in the headnotes to Schedule 6, Part 2 of the Tariff Schedules of the United States Annotated ("TSUSA"), for blooms, billets, slabs, sheet bars, bars, wire rods, plates, sheets, strip, wire, rails, joint bars, tie plates, or any tubular products set forth in the TSUSA, having a maximum cross-sectional dimension of 3 inches or more, as currently provided for in items 609.8005, 609.8015, 609.8035, 609.8041, or 609.8045 of the TSUSA. Such products are generally referred to as structural shapes.

Appendix III—Arrangement

\*　　\*　　\*　　\*　　\*　　\*

4. Export Limits. (a) For the period 1st November 1982 to 31 December 1983 (hereinafter called "the Initial Period") and thereafter for each of the years 1984 and 1985 export licenses shall be required for the Arrangement products. Such licenses shall be issued to Community exporters for each product in quantities no greater than the following percentages of the projected U.S. Apparent Consumption (hereinafter called "export ceilings") for the relevant period:

\*　　\*　　\*　　\*　　\*　　\*

(c) For the purposes of this Arrangement the USA shall comprise both the U.S. Customs Territory and U.S. Foreign Trade Zones. In consequence the entry into the U.S. Customs Territory of Arrangement products which have already entered into a Foreign Trade Zone shall not then be again taken into account as imports of Arrangement products.

APPENDIX B—PRODUCT COVERAGE

| * | * | * | * | * | * |
|---|---|---|---|---|---|
| Carbon Steel | 73.11–12,73.11–14, | | | 609.8005, | |
| Structural | 73.11–16,73.11–19, | | | 609.8015, | |
| Shapes | 73.11–20,73.11–31, | | | 609.8035, | |
| | 73.11–39,73.63–10, | | | 609.8041, | |
| | 73.63–29,73.63–50, | | | 609.8045. | |

Plaintiff, on January 24, 1984, attempted to enter the involved merchandise under Item 609.80(45) TSUS. On January 25, 1984, the entry was rejected and returned, advising plaintiff to supply SSSI's and ECSC export certificates.

Plaintiff's second count in the complaint, relating to classification under 692.3288 TSUS covering parts of motor vehicles, etc., was abandoned at the trial and is, therefore, dismissed.

Subsequently, on January 31, 1984, plaintiff attempted to enter the eight types of carbon steel special rim sections under 609.8400 TSUS, which covers sections of steel hot rolled and otherwise advanced. On February 2, 1984 this entry was rejected for the same reasons, the lack of SSSI's and ECSC export certificates.

Count IV of the complaint covers an attempt to enter, on February 3, 1984, the three different types of steel hinge sections into the Foreign Trade Zone. On the 8th of February 1984, the entry was rejected for the same reasons.

The record consists of the testimony of five witnesses called on behalf of plaintiff and one called by defendant. In addition to the numerous exhibits received in evidence for both parties, there was a jointly stipulated exhibit and one unnumbered exhibit. The special steel sections involved herein are manufactured according to customer specifications. Usually the customer supplies a drawing to the manufacturer with specifications set forth therein. The manufacturer then prepares an engineering drawing which, if acceptable, is initialed by the customer. An order is then placed for delivery of a section. After an order is received arrangements are made for the production of rolls and roll accessories. The parties stipulated the merchandise weighs over .29 pounds per linear foot.

The special sections are manufactured starting with the heating of blooms to rolling temperature. These are then conveyed to the various stands, at which time the cross section of the bloom is reduced, the length is proportionately increased, and the shape changed to the desired contour. The length at the finishing stand is approximately 50 to 80 meters. The bloom from which it started had a maximum length of seven meters.

After the section has passed the finishing stand, it is transported to the "hot sawing device", where it is cut to the customers desired length. At this point it is transported to a cooling bed to permit the sections to cool down. After cooling down it is transported to the straightening machine which straightens the sections to an 0.25 percent tolerance. The sections are then sent to the piling device to prepare for delivery.

With respect to the rim sections, prior to being readied for shipment they are cut to so-called usage lengths by a shearing machine. These must be cut with a tolerance of plus or minus three millimeters. The rim sections have also been knurled by milling.

The hinge sections, in addition to the foregoing process, require a shaving operation to remove the caliber overfill. This is accomplished on a circular shear and occurs after the straightening operation.

The testimony of the witnesses questioned on the language of structural shapes or structurals agreed the special sections involved does not fall within either category.

The manufacture of hinges from the imported special sections by the customer of plaintiff requires numerous operations after importation. A long length of the bar is cut by a punch shearing press to the width desired. It is then subjected to a wheelabrating process, which removes rust and scale from the steel. Thereafter the steel is subjected to notching and piercing. This process, also known as brooching, removes metal and makes the section into a

specific configuration. In the restrike operation the item is checked to make sure it is holding the desired configuration. The hinge piece is drilled and subjected to a pickling operation, which removes oil, chips and scale by the use of acid. The hinge is washed, rinsed and zinc phosphate coated to prevent rust.

Rims are manufactured from the imported sections by first placing the steel in a circling machine to form a cylinder. After this operation, since the ends are not in perfect alignment, it is subjected to. a shearing operation to correct it. Due to the shearing operation there is a space between the ends which must be pressed together by a press. The rim is then butt welded, with the excess welding being trimmed off by a rotary trimmer. This is done in two operations, one side at a time.

The next operation is called coining, in which pressure is applied between the coin dye and the rim in sufficient force to smooth any imperfections on the rim surface. A grinding operation is then performed to cover any edge area missed by the rotary trimmer operation. The rim is then brought to the shrink machine to remove part of the conical condition. An expanding operation is then utilized to expand the rim and test the weld. A final shrink operation is performed to set the outside diameter within the tolerances as to size and roundness specified by the customer.

Plaintiff's primary contention, Count I of its complaint, is based upon the premise that the imported special sections are properly subject to classification under 609.-80(45), as classified, but are not subject to the Arrangement. Accordingly, an export certificate or a Special Summary Steel Invoice would not be required. This theory is based upon the language utilized in Appendix B of the Arrangement under the heading "Description", which sets forth "Carbon Steel Structural Shapes", and then lists NIMEXE number and TSUSA numbers, which includes 609.80(45). Plaintiff contends both the description and the TSUSA number are necessary to embrace the merchandise. In other words, plaintiff contends that carbon steel structural shapes covered by 609.80(45) are Arrangement products, but not the special sections involved herein. Defendant contends all the sections covered by 609.80(45) are Arrangement products.

Congress, in its effort to assist the steel industry of the United States, enacted 19 U.S.C. § 1626 on October 2, 1982. The language of said provision, as indicated *supra*, makes the intent clear. Subsequently, an Arrangement, effective October 29, 1982, was entered into by the United States and the ECSC.

The purposes of the Arrangement are to: (1) permit the ECSC to restructure the European steel industry by progressively eliminating subsidies; (2) permit the domestic steel industry to modernize and change; and (3) create a period of stability in trade in certain steel products between the Community and the USA (47 Fed.Reg. at 49061).

■ The authority for the Executive Branch of the United States to enter into such arrangement was delegated by the previous enactment of 19 U.S.C. § 1626. Accordingly, any argument of the lack of authority by the Executive Branch to enter into such an agreement is without merit.

■ The utilization of the terms "carbon steel structural shapes" or "structurals" by the Arrangement does not, in the opinion of the Court, limit Item 609.80(45) to only such items as are commonly or commercially known as those articles.

Examination of the Tariff Schedules of the United States (TSUS) establishes the term "structural shapes" is not contained therein. The term "structural units" is utilized in Items 652.93 to 652.96, but said item numbers are not contained in the Arrangement. In view of the foregoing, the utilization of the terms "structural shapes" or "structurals", standing alone, cannot delineate the scope of the Arrangement Products. Rather, the utilization of the TSUS and NIMEXE (the European Community tariff classification) numbers permits the ECSC and the U.S. Customs Service to define precisely which products are

"Arrangement Products" and, therefore, require an export certificate.

In addition, the Arrangement defines what the parties intended to be encompassed by the term "structural shapes." The definition, which includes "Sections", together with Item No. 609.80(45), makes clear the intent of the parties to include merchandise such as involved herein. In view of the definition contained in the Arrangement and the language of 609.80(45), if the Court were to follow the contention of plaintiff and limit such items to those commercially or commonly known as "structural shapes", it would be contrary to the intent of the negotiating parties to the Arrangement.

Plaintiff further contends the processes utilized after the sections complete the finishing stand (i.e., straightening, cutting, knurling or shaving of the overfill on the hinge sections) constitute advancements and, as such, the sections are subject to duty under Item 609.8400. Under this classification an export certificate and a Special Summary Steel Invoice would not be required.

■ The record indicates the involved special sections are made to the specifications of the customer and are required to have the above processes performed upon them. The law is well settled that no step in the creation of an article is at the same time an advancement. *United States v. Philipp Overseas, Inc.*, 68 CCPA 43, C.A.D. 1263, 651 F.2d 747 (1981); *United States v. Baron Tube Co., et al.*, 47 CCPA 69, C.A.D. 730 (1960); *Commercial Shearing & Stamping Co. v. United States*, 65 Cust.Ct. 91, C.D. 4060, 317 F.Supp. 750 (1970), aff'd, 59 CCPA 203, C.A.D. 1067, 464 F.2d 1048 (1972).

■ Notwithstanding the fact the imported special sections were made to specifications, which include the so-called advancement processes, case law has negated these processes as advancements. The mere fact that these processes could have been applied to the sections by the customer, with tools readily available, does not assist in the contention that they constitute advancements.

The process of straightening has been held not to be an advancement. *United States v. Philipp Overseas Inc., supra; Avins Industrial Products Co. v. United States*, 72 Cust.Ct. 43, C.D. 4503, 376 F.Supp. 879 (1974), *reh. den.*, 72 Cust.Ct. 147, C.D. 4522 (1974), aff'd 62 CCPA 83, C.A.D. 1150, 515 F.2d 782 (1975).

Additionally, cutting to length or to customer specification has been held not to be an advancement. In *Associated Metals & Minerals Corp. v. United States*, 65 Cust.Ct. 586, C.D. 4143 (1975), the Court made the following observation:

> [A]lthough the plates were sheared to size and shape according to specification, we do not regard such shearing as an advancement * * *. Instead, it appears that such shearing was necessary to produce plates which met the size and shape specified by the importer.

■ Knurling amounts to a deformation of the section and, as such, does not constitute an advancement. In *Commercial Shearing & Stamping Co. v. United States, supra*, the Court described the manufacturing process of the merchandise involved and indicated that the use of a press and die causes "the metal to plastically deform". The Court therein held the merchandise, which was also subjected to other processes, not to be advanced within the language of Item 609.80, *supra*.

■ The shaving process to remove the caliber overfill or excrescent material is not considered an advancement within the intent of Schedule 6, Part 2, Headnote 1 or within the holding in *Commercial Shearing, supra; American Mannex Corp. v. United States*, 56 Cust.Ct. 31, C.D. 2608 (1966). It is also noted that cutting to length, cooling and straightening were held in *American Mannex* not to be advancements. Accordingly, plaintiff's claim that said merchandise is subject to classification under Item 609.8400 cannot be sustained.

The final argument presented for consideration is whether Customs correctly required ECSC export certificates and Special Steel Summary Invoices for entry of merchandise into the Foreign Trade Zone. Plaintiff contends this requirement by Cus-

toms and its refusal to permit entry into the Zone was improper. Plaintiff further contends that Article 4c of the Arrangement is unlawful since it is without statutory authority and contrary to the Foreign Trade Zones Act, 19 U.S.C. § 81a *et seq.*

A plain reading of 19 U.S.C. § 1626 is indicative of the intent of Congress, as noted *supra*, to delegate authority to the Executive Branch in order to monitor steel mill products and enforce export measures required by foreign governments for entry in the United States pursuant to an international agreement. The Arrangement, Article 4c, defines the U.S.A. as comprising "both the U.S. Customs Territory and U.S. Foreign Trade Zones". From this it is clear that Customs acted properly within the language of Article 4c. The underlying question presented, however, is whether there was authority delegated to enter into an agreement which is contrary to a previously enacted statutory provision, 19 U.S.C. § 81a *et seq.*

■ Plaintiff urges the Court to find Article 4c of the Arrangement, which imposes conditions beyond the scope of 19 U.S.C. § 1626 and in violation of 19 U.S.C. § 81a *et seq.*, invalid. There is no question that ordinarily, and under the provision of the Foreign Trade Zone Act, 19 U.S.C. § 81a *et seq.*, a Foreign Trade Zone is not within the Customs Territory of the United States. However, in interpreting a statute, the Court must give effect to the statutory purpose and legislative intent. *Mount Washington Tanker Company v. United States,* 1 CIT 32, 505 F.Supp. 209 (1980), aff'd, 69 CCPA 23, 665 F.2d 340 (1981).

■ From the language of 19 U.S.C. § 1626 and the record of the Congressional debates preceding its enactment, it seems clear the purpose of said statute is to assist the steel industry of the United States. The intent of the negotiators of the Arrangement was to have the ECSC restructure its steel industry to eliminate state aids and to "restrain exports to or destined for consumption in the U.S.A. of * * * Arrangement products." With these purposes in mind, the language of 4c is in accordance with the intent of the drafters of the statute and the negotiators of the Arrangement. To hold otherwise would defeat the purpose for which § 1626 was enacted. If in the case at bar the merchandise was permitted into the Foreign Trade Zone and there manipulated to the point that it might be considered advanced, it would then be permitted to be entered under Item 609.8400 without the requirement of the special documentation. While American labor would be utilized in "advancing" the merchandise, this would not assist the steel industry but only that segment of non-mill steel workers who are utilized to perform the work in the Foreign Trade Zone. This was obviously not the intent of Congress in delegating the authority to enter into the Arrangement.

To hold Article 4c of the Arrangement void would, in the opinion of the Court, frustrate the intent of Congress in its attempt to assist the steel industry.

In view of the foregoing, the claims of plaintiff are overruled, and the action is dismissed.

Judgment will be entered accordingly.